WILLIAM M. LAMBERT, PLAINTIFF-APPELLANT, v. FISH-ERMEN'S DOCK COOPERATIVE, INC., DEFENDANT-RE-SPONDENT.

Argued September 25, 1972—Decided December 4, 1972.

*Mr. Thomas J. Gunning* argued the cause for appellant (*Messrs. Rogers, Sim, Sinn, Gunning and Serpentelli,* attorneys).

*Mr. Robert F. Novins* argued the cause for respondent (*Messrs. Novins, Novins and Farley,* attorneys; *Mr. Harvey L. York,* on the brief).

The opinion of the Court was delivered by

MOUNTAIN, J. In this action plaintiff sought a recovery of the value of his stock or membership interest in the defendant cooperative as well as an accounting for patronage

dividends to which he claimed to be entitled. The trial judge, sitting without a jury, fixed the value of his stock interest at $15,092.10 and his claim for patronage dividends in the amount of $3,406.76 for a total judgment of $18,498.86. On defendant's appeal to the Appellate Division, that court reduced the value of the stock interest to $125 and the dividend claim to $2,309.04. 115 *N. J. Super.* 424 (App. Div. 1971). We granted plaintiff's petition for certification. 59 *N. J.* 434 (1971).

At oral argument the issue concerning patronage dividends was withdrawn, leaving only for our review the question of the value of his stock interest.

The underlying facts are set forth fully in the opinion of the Appellate Division and we summarize them only briefly here. Defendant is a fishermen's cooperative association, incorporated in 1953 under the provisions of *N. J. S. A.* 34:17-1 *et seq.* Plaintiff joined the association in 1957, purchasing two shares of stock for $125. In July, 1965, his membership in the association was terminated by defendant's board of directors because he was no longer engaged in the fishing industry and hence did no business with defendant. At the time, plaintiff made no real objection to the fact of his expulsion, nor does he now claim it to have been improper. The by-laws provided that as a continuing condition of membership, a stockholder must be a producer of aquatic products, and it is undisputed that at the time of expulsion plaintiff no longer met this requirement. His objection is that he did not receive the amount to which he was justly entitled upon the redemption of his shares. This poses the only real issue before the court.

In 1957, the time plaintiff became a stockholder, a by-law of the association stated that upon termination of membership a stockholder was entitled to receive the "fair book value" of his shares. In 1962 this by-law was amended to provide that henceforth, instead of "fair book value," a retiring member would be entitled to a return only of the price he had originally paid for his stock. Plaintiff strongly

objected to this amendment at the time of its adoption. Both the certificate of association and the by-laws at all times contained provisions authorizing the amendment of the by-laws by majority vote of the membership.

The trial court agreed with plaintiff that the amended by-law, altering the consideration to be received upon the redemption of shares from fair book value to original purchase price, was invalid as violating a contract, infringing upon a vested right, and exceeding such authority as was bestowed upon the majority by its reserved power to amend by-laws. The Appellate Division disagreed, holding that the power reserved to the majority to amend the by-laws of the association was ample to support the questioned amendment and therefore the amendment became binding upon the plaintiff upon its adoption. Upon this crucial point we find ourselves in agreement with the trial judge.

It is the law generally that a reserved right to amend the by-laws of an association, whether to be exercised by the majority or, in some cases, a larger proportion of stockholders, members or directors, is a limited rather than an absolute right, even though the reservation is expressed in broad and general terms. It is often said that such a right to amend may not be extended so as to impair or destroy a contract or vested right, that it does not authorize the adoption of an amendment which will have such an effect, and that in general the exercise of such a right should be confined to matters touching the administrative policies and affairs of the corporation, the relations of members and officers with the corporation and among themselves, and like matters of internal concern. 8 *Fletcher, Cyclopedia Corporations* (Perm. Ed.) § 4177; 1 *Hornstein, Corporation Law and Practice,* (1959) § 269.

In New Jersey this rule, that a reserved power to amend by-laws may not affect basic rights, has found expression in a number of cases; interestingly, most of these deal with societies and associations which are similar to the defendant cooperative in that they were created to foster

some kind of mutual benefit. *O'Neill v. Supreme Council, American Legion of Honor,* 70 *N. J. L.* 410, 420–421 (Sup. Ct. 1904); *Sautter v. Supreme Conclave Improved Order of Heptasophs,* 72 *N. J. L.* 325, 326–327 (Sup. Ct. 1906), aff'd 76 *N. J. L.* 763 (E. & A. 1908); *Poole v. Supreme Circle, Brotherhood of America,* 85 *A.* 821 (Ch. 1911), aff'd 80 *N. J. Eq.* 259 (E. & A. 1912); *Parks v. Supreme Circle, Brotherhood of America,* 83 *N. J. Eq.* 131, 135 (Ch. 1914); *Coghlan v. Supreme Conclave Improved Order of Heptasophs,* 86 *N. J. L.* 41, 47 (Sup. Ct. 1914); *St. John's Baptist Society, etc., v. Ukrainian National Association, Inc.,* 105 *N. J. Eq.* 69 (Ch. 1929); *Yager v. American Life Insurance Association,* 44 *N. J. Super.* 575 (App. Div. 1957).

In *O'Neill,* the defendant organization had issued a benefit certificate to the plaintiff, one of its members. By the terms of the certificate, the defendant agreed that, in consideration for the receipt of a stated monthly assessment, it would pay, upon plaintiff's death, the sum of $5,000 to his named beneficiaries. By the terms of the arrangement plaintiff agreed to be bound by all by-laws of the defendant then existing or thereafter adopted. A later by-law fixed $2,000 as the most that would be paid under any benefit certificate, and at the same time reduced the monthly assessments proportionately. Plaintiff's challenge to this action was sustained. Announcing the pertinent rule, Justice Pitney said,

But it is very generally, if not universally, held that these benefit certificates, like other contracts, confer a vested interest upon the member, which may not be impaired by a subsequent amendment, even though the power to amend be reserved in general terms. If the member's stipulation to comply with all by-laws thereafter enacted could be construed to relate to a by-law that reduced the benefit from $5,000 to $2,000, it must also relate to a by-law canceling the benefit certificate entirely — a result wholly unjust and absurd. The stipulation must be construed as referring only to reasonable by-laws and amendments adopted in furtherance of the contract, and not to such as would overthrow it or materially alter its terms. [*O'Neill v. Supreme Council, American Legion of Honor,* 70 *N. J. L.* 420–421 (1904)]

The *Sautter* case presented a very similar issue. Plaintiff was the beneficiary named in a benefit certificate issued to her late husband by defendant. The certificate provided that, upon the death of the insured, satisfactory proof thereof, and the surrender of the certificate, the defendant would pay $1,000 to the insured's designated beneficiary. The decedent had expressly agreed that he would abide and be bound by all by-laws and other appropriate regulations of the defendant, including those adopted thereafter. Later the defendant association adopted a by-law denying benefits in those cases where the insured died by suicide. Subsequently the insured committed suicide and defendant refused payment. The court held that the amended by-law in no way affected plaintiff's rights. It said,

> The plea demurred to sets forth no facts which constitute a bar to this action. It does not aver any violation by the insured of any law, rule, or regulation of the association enacted by it for its government or for the government of its funds; but, by way of argument, asserts that he, by entering into the stipulation which it recites, agreed that the association might, at will, so change the contract of insurance as to relieve it, to a material extent, from the liability created thereby. We think such a construction of the stipulation is not warranted by its language. To say that it confers upon the association the power to so alter the contract of insurance by an after adopted by-law as to destroy the right of the beneficiary to be paid the amount called for by the certificate in case the insured shall die by his own hand, is equivalent to saying that it authorized the association to limit its liability to such an extent as it chose, for instance, by providing that no benefit shall be paid in case the death of the insured shall result from an accident occurring through his own negligence, or from a disease which is epidemic in its character, or from any other cause or causes which it may designate. An agreement, by a person applying for membership in one of these fraternal organizations, and for insurance therein, that he will comply with such rules and regulations as the association may thereafter enact for its own government, or the government of its death fund, cannot be construed into a stipulation conferring any such power as has been suggested, without disregarding the plain meaning of the words of the agreement. [*Sautter v. Supreme Conclave Improved Order of Heptasophs*, 72 *N. J. L.* 326–327 (1905)]

In *St. John's Baptist Society*, it appeared that defendant, a parent organization, had, by the terms of its by-laws and

by the terms of charters issued to local branch organizations, accorded such branches a right of representation at its national conventions with the privilege of sending delegates at defendant's expense. Defendant had reserved the right to amend its by-laws, which were declared to be binding upon all local branches. A later amendment of these by-laws had the effect of depriving many branches of this privilege of delegate representation. The court held the amendment to be an improper and invalid violation of the charter rights of such branches. It pointed out that "[s]uch vested rights may not be impaired by subsequent amendment of the by-laws under a power to amend reserved in general terms" and concluded that "[t]he reserved right to amend must be construed as referring only to reasonable amendments and not to such as would materially alter the charter contract." 105 *N. J.* Eq. at 72–73.

Elsewhere the general rule limiting the exercise of the reserved right to amend by-laws to such matters as will not substantially affect basic rights of stockholders or members has been applied to cooperatives like the defendant. In *Whitney v. Farmers Co-op. Grain Co.,* 110 *Neb.* 157, 193 *N. W.* 103 (1923), at the time plaintiff became a stockholder-member, a by-law of the defendant provided that it would repurchase his stock at a designated price in the event that he should later move out of the marketing area. This by-law was later rescinded. Plaintiff thereafter moved from the area so that he was no longer able to avail himself of defendant's services, whereupon he requested the defendant to repurchase his stock in accordance with the original by-law. This the defendant refused to do, pointing out that the by-law had been rescinded and that plaintiff had originally agreed to be bound by all defendant's by-laws, both those then in existence and those thereafter adopted. The court found for the plaintiff, holding that the reserved right to amend, even though coupled with plaintiff's original agreement to be bound by any subsequent exercise thereof, did not justify defendant's abrogation of its contract to re-

purchase. For an identical holding upon substantially the same facts, see *Loch v. Paola Farmers' Union Co-op Creamery & Store Association*, 130 *Kan.* 136, 285 *P.* 523 (1930); reh. den. 130 *Kan.* 522, 287 *P.* 269 (1930).

█ Accordingly we hold that the amended by-law adopted in 1962 by Fishermen's Dock Cooperative was ineffective to divest the plaintiff of the right given him under the by-law in effect when he purchased his stock, namely, to receive upon the termination of his membership, the fair book value of his shares.

This brings us to a consideration of what is meant here by "fair book value." Plaintiff urges, and the trial court substantially agreed, that this was to be determined by finding the present *market* value of the corporation's assets, subtracting existing liabilities, and dividing the difference, or net worth, by the number of shares outstanding. Accordingly the court received in evidence the testimony of an expert witness that the present market value of defendant's physical plant—land and buildings—is about $500,000. Placing substantial reliance upon this testimony, the court determined that each of plaintiff's two shares was worth $7,575.

Defendant's accountant, on the other hand, testified that book value is a reflection of the corporation's net worth as determined from its books of account, assuming that these have been kept accurately and in accordance with recognized accounting practices. As to the books that defendant had kept, he testified that assets were initially entered at cost, depreciable assets were thereafter depreciated, and inventory and accounts receivable were periodically adjusted downward to reflect, respectively, decreased market value and uncollectibility. As so calculated he fixed book value at about $455 per share.

█ Most courts have agreed that there is no single definition of book value that can be automatically applied in all cases. See Annotation, "Meaning of 'Book Value' of Corporate Stock," 51 *A. L. R.* 2d 606 (1957). The inten-

tion of the parties to the contract or other arrangement wherein the concept of book value has significance must always be sought. Thus, as an example, although generally the element of good will is excluded from a calculation of book value, *Hollister v. Fiedler,* 18 *N. J. Super.* 171, 175–176 (Ch. Div. 1952), rev'd on other grounds, 22 *N. J. Super.* 439 (*App. Div.* 1952); *Early v. Moor,* 249 *Mass.* 223, 144 *N. E.* 108 (1924); *Lane v. Barnard,* 185 *App. Div.* 754, 173 *N. Y. S.* 714 (1919), it will nevertheless be included where it can be clearly demonstrated that such was the intention of the parties. *Bernheim v. Duane,* 209 *Ky.* 744, 273 *S. W.* 458 (1925); *Re Lindsay's Estate,* 210 *Pa.* 224, 59 *A.* 1074 (1904). In this case we determine fair book value, as of the date of plaintiff's expulsion, to mean the value of defendant's assets as set forth in its books at that time, after subtracting liabilities, without reference to then present market value. Parenthetically we note that this was the meaning apparently attributed to these words by the defendant itself in redeeming shares of expelled or retiring members prior to the enactment of the 1962 amendment. Our conclusion is based upon the assumptions—which plaintiff may challenge on remand—that the books have been kept accurately and in accordance with sound and recognized accounting practices. Although nothing in any of the documents before us suggests that fair book value was to be equated in any way with market value, we are the more convinced that such should not be the case here, in view of the fact that defendant is a cooperative venture, created to serve its members rather than to make money. Should a retiring or expelled shareholder be entitled to payment based on market value, it might be impossible to meet such payment without in effect bringing about the dissolution of the corporation. Clearly there was never any such intention.

Although not raised as an issue before us, we deem it advisable to comment upon the problem that will be presented

if defendant undertakes liquidation.[1] Several alternatives present themselves. The members (stockholders) of the cooperative may be entitled to a distribution of the proceeds of the assets, after the payment of debts, in accordance with their share holdings. Such a method of liquidation has met with approval elsewhere: *Schroeder v. Meridian Improvemen Club,* 36 *Wash.* 2d 925, 221 *P.* 2d 544 (1950); *Avon Gin Co. v. Bond,* 198 *Miss.* 197, 22 *So.* 2d 362 (1945) (statute); *Packel, Organization and Operation of Cooperatives* (4th ed.) 203. At least one court has held that the assets of a particular non-stock cooperative should be distributed by an exercise of the *cy pres* power, as if it were a charitable organization. *Attinson v. Consumer-Farmer Milk Coop.,* 197 *Misc.* 336, 94 *N. Y. S.* 2d 891 (1950). In an early case in this state it was held, with respect to an unincorporated association, that distribution must be made, not only to those persons who were members at the time of liquidation, but to past members as well, since they had all helped to create the assets to be apportioned. *Smith v. Hunterdon County Mutual Fire Insurance Co.,* 41 *N. J. Eq.* 473 (Ch. 1886). We express no view at this time as to how this issue should ultimately be resolved with respect to this defendant, but liquidation should not take place except with court approval. In proceedings seeking such approval the Commissioner of Labor and Industry should be made a party. We say this because the statute under which defendant has been incorporated required the Commissioner's approval of the original certificate of association, *N. J. S. A.* 34:17-3, and further provides for the annual submission to him of a rather detailed report. *N. J. S. A.* 34:17-12. In view of this allocation by the Legislature of the responsi-

---

[1] The record reveals that following plaintiff's expulsion, and at the same meeting of the directors, a resolution to dissolve was formally adopted. Apparently no further action has been taken toward this end.

bility of supervision, the Commissioner's views would obviously be of great interest to the court.

We deem a remand necessary to insure that justice is afforded the plaintiff. It is true that he had an opportunity to present evidence as to the fair book value of his stock at the original trial, and in fact did so. But the view of the matter entertained by the trial judge necessarily precluded the plaintiff from challenging book value as developed by the defendant or from offering independent proofs looking to a determination of book value in the manner set forth above.

The judgment of the Appellate Division is modified accordingly and the case remanded to the Law Division for further proceedings not inconsistent herewith.

*For modification and remandment*—Chief Justice WEINTRAUB, Justices JACOBS, PROCTOR, HALL and MOUNTAIN, and Judges CONFORD and SULLIVAN—7.

*Opposed*—None.