James F. SKANE, Appellant (Plaintiff),

v.

STAR VALLEY RANCH ASSOCIATION, a Wyoming non-profit corporation; Vern C. Bloxham, in his individual capacity; Joseph Merrill in his official capacity as President of the Star Valley Ranch Association; Charles V. King, Robert S. White, Robert G. Henry, Sharon Ward, and Rod Port, in their official capacities as directors of the Star Valley Ranch Association, Appellees (Defendants).

No. 91–111.

Supreme Court of Wyoming.

Feb. 14, 1992.

George L. Arnold of George L. Arnold, P.C., Evanston, for appellant.

Dwight "Bob" Despain, Casper, for appellees Star Valley Ranch Ass'n, Joseph Merrill, Charles V. King, Robert S. White, Robert G. Henry, Sharon Ward, and Rod Port.

Bret F. King of King & King, Jackson, and F. Randall Kline, Pocatello, Idaho, for appellee Vern C. Bloxham.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

MACY, Justice.

Appellant James Skane appeals from a partial summary judgment determining that he suffered no compensatory damages as a result of alleged improprieties in the election held by the Board of Directors of Appellee Star Valley Ranch Association and determining that the Board of Directors' amendment of the Association's by-law requiring a vote by two-thirds of the members to amend the by-laws was proper and within the powers of the Board of Directors.

We affirm.

The issues presented by Skane are:

A. The Issues Stemming from the 1987 Annual Election of Directors (Count I Below)

1. Whether, if to support causes of action for trespass and breach of fiduciary duty, there must be a showing of actual damages.

2. Whether mental anguish, emotional distress and/or humiliation constitute an element of actual damages, and if so, whether such element was proven to exist, or not to exist, as a matter of law.

3. If the evidence is viewed in a light most favorable to Appellant, whether Appellant established causes of action for trespass and/or breach of fiduciary duty against Vern Bloxham (herein "Bloxham") and/or the Star Valley Ranch Association (herein "Association").

4. If a cause of action exists against Bloxham, whether, as a matter of law, his acts of commission and omission were committed under circumstances constituting legal malice for which exemplary damages may be awarded.

5. If a cause of action does exist against the Association, whether, as a matter of law, the Association is liable to Appellant for actual and exemplary damages by reason of a) the existence of a vicarious relationship from Bloxham to the Association and/or b) the acts of commission and omission of agents of the Association other than Bloxham.

B. The Issues Stemming from the Amendment to Article XI, Section 1 of the By[–L]aws (Count II Below)

1. Whether the amendment to Article XI, Section 1 of the Association's by[-]laws, as adopted by a resolution of the Board of Directors on May 17, 1986, disturbed vested contractual and property rights of the Appellant as a Member of the Association.

2. Whether the amendment to Article XI, Section 1 of the Association's by[-]laws is unreasonable, oppressive or arbitrary.

3. Whether the amendment to Article XI, Section 1 of the Association's by[-]laws was adopted in bad faith by the Board of Directors.

4. Whether appellant was entitled to an injunction directing the reinstatement of Article XI, Section 1 of the Association's by[-]laws to the provision, content and language existing in said article and section prior to May 17, 1986.

Star Valley Ranch Association (the Association) is a recreational subdivision located in Lincoln County, Wyoming. At its 1987 annual meeting, the Association held an election to fill three positions on the Board of Directors. Skane was one of six candidates vying for these positions. He lost the election and allegedly suffered mental anguish because invalid votes were cast and because the voting records were lost before he could verify their accuracy.

To recover for his mental anguish, Skane brought suit against the Association, a nonprofit corporation; several Association directors, none of whom were directors dur-

ing the 1987 election;[1] and Appellee Vern Bloxham, in his individual capacity. Bloxham was acting president and general manager of the Association during the election, although he had no responsibility for conducting the election itself.

Before the 1987 annual meeting and election, the Board of Directors adopted election guidelines to be used in the 1987 election. The guidelines, among other things, suspended the voting rights of all members who were delinquent in paying their assessments. The election guidelines further provided a procedure whereby an individual who suspected that improprieties existed in the election could have his suspicions investigated, provided he registered his complaint with the Association within thirty days after the election.

Also to ensure the election was proper, a resolution was introduced at the 1987 annual meeting proposing to preserve the election voting records until each candidate had signed a release acknowledging he was satisfied that the vote count was accurate. The resolution was not contained in the minutes of the 1987 annual meeting; however, an Association member made a private tape recording and transcript of the entire meeting. The transcript is ambiguous as to whether or not the Association actually passed the resolution.

At the election, the Association's secretary voted twenty-one lots owned by the Association, some of which had been obtained through foreclosure actions and were still within the redemption periods. In another alleged impropriety, an individual presented a list to the election vice-chairman of ninety-seven members who had issued proxies, but he failed to furnish any of the actual proxies as was required. A determination was later made that thirty-two of the ninety-seven proxies had been granted by members who were delinquent in paying their Association assessments. All ninety-seven proxy votes were cast.

After the election, Skane sent a letter dated July 26, 1987, to the Association and

its legal counsel, requesting that a recount be made of the votes and that he be given verification of the voting procedures. Bloxham received the letter on August 6, 1987, forty days after the election had been held. On that same day, Bloxham was cleaning out the Association's office and decided to empty two safety deposit boxes located in the Star Valley State Bank in Afton, one of which contained the voting records. Bloxham went to the bank to remove the records but was denied admittance because he was not listed as one of the box's renters. Bloxham telephoned Donna Duntsch, one of the named renters, and ordered her to remove the records. Duntsch went to the bank, removed the records, and took them to her residence. Later that evening, Bloxham went to Duntsch's house, retrieved the records, and placed them in his pickup truck's toolbox. He has no knowledge of the records' subsequent whereabouts.

Skane essentially raises two issues concerning the election: (1) Whether Bloxham committed a trespass for which Skane could recover mental anguish and punitive damages; and (2) whether Appellees breached a fiduciary duty to Skane for which he could recover mental anguish and punitive damages.

We approach this case using our well established principles for reviewing summary judgments. *Baros v. Wells,* 780 P.2d 341, 342 (Wyo.1989).

### Trespass

■ According to Skane, Bloxham committed a trespass by ordering Duntsch to remove the voting records from the safety deposit box and by leaving them in the back of his pickup truck. Skane claims he suffered emotional distress as a result of this trespass.

In Wyoming, "[t]he gist of the action of trespass is injury to possession, and the plaintiff must show either possession or a right to take immediate possession at the

---

1. Appellee Joseph Merrill was elected to the Board of Directors in 1985 and was up for reelection in the 1987 election.

time of the trespass." *Noble & Carmody v. Hudson*, 20 Wyo. 227, 236, 122 P. 901 (1912). *See also Ruby Drilling Co., Inc. v. Billingsly*, 660 P.2d 377 (Wyo.1983). Wyoming cases requiring a plaintiff to show he had a possessory right have been decided in the context of a trespass to land, whereas Skane claimed a trespass to chattel. Despite this distinction, one asserting a trespass to chattel must still demonstrate that he has a possessory interest. *See* RESTATEMENT (SECOND) OF TORTS § 217 (1965).

Skane advances two theories which purportedly gave him a possessory interest in the voting records. First, he claims he obtained a possessory interest in the records when he requested a recount of the votes in his letter dated July 26, 1987. We disagree. Skane's letter could not have given him a possessory interest in the voting records because complaints concerning election improprieties had to be registered within thirty days after the election and Skane's letter was not received until forty days after the election had occurred.

Second, Skane contends the resolution which was introduced at the 1987 annual meeting requiring each candidate to sign a release indicating his satisfaction with the vote's accuracy gave him a possessory interest in the voting records. Assuming the resolution did pass, Skane's interest would consist of the right to have the votes recounted.[2] Such a right would not give him a possessory interest in the voting records. According to the RESTATEMENT, *supra* § 216, at 415, "[A] person who is in 'possession of a chattel' is one who has physical control of the chattel with the intent to exercise such control on his own behalf, or on behalf of another." Skane had no right to physically control the voting records, nor did he have the right to demand to have physical control.

We hold that, as a matter of law, Skane lacked a possessory interest in the voting records. Absent such a possessory inter-est, Skane could not bring an action in trespass. Because Skane could not maintain an action in trespass, he could not recover actual damages.[3] Without actual damages, Skane could not recover punitive damages, and no separate cause of action existed for the recovery of punitive damages alone. *Cates v. Barb*, 650 P.2d 1159, 1161 (Wyo.1982).

### Fiduciary Duty

■ Skane argues that Appellees, as officers and directors of the Association, breached a fiduciary duty owed to him as a member of the Association. Appellees allegedly breached their fiduciary duty by destroying the voting records, allowing votes to be cast for members who were delinquent in paying their assessments, and voting lots which were still in foreclosure. The only allegation supported by conduct which might be construed as wrongful was that Bloxham disposed of the voting records by leaving them in his pickup truck. Yet, even if we assume *arguendo* that, when he lost the voting records, Bloxham breached a fiduciary duty, Skane still could not recover because he did not suffer actual damages.

■ Skane did not seek nominal damages or injunctive relief to correct improprieties in the election. Rather, he sought actual damages for his mental anguish and exemplary damages to punish Appellees' conduct. The burden of proving damages beyond nominal damages is on the party seeking the recovery. *Willmschen v. Meeker*, 750 P.2d 669, 672 (Wyo.1988). Damages cannot be presumed. *Id.; State ex rel. Scholl v. Anselmi*, 640 P.2d 746, 750 (Wyo.), *appeal dismissed and cert. denied*, 459 U.S. 805, 103 S.Ct. 28, 74 L.Ed.2d 43 (1982). In his deposition, Skane described his mental anguish as follows:

Q As to mental anguish, would you describe for me the degree of anguish that you went through?

2. We are also assuming, without deciding, that a private individual could record an annual meeting and have that recording be binding upon the Association.

3. Because Skane cannot maintain an action in trespass, we do not need to consider whether mental anguish damages are recoverable in a trespass action.

A    All I can answer to that is that I was extremely angry and upset that this could have happened, very disappointed that the board, after my appeal for a recount, did not react as I felt they should have.

To a greater degree, I cannot give you any description.    I was not climbing walls, I was not throwing things.    I was very deeply concerned and upset that our own association would behave in such a manner through the improper actions of certain of its employees or directors or their essential responsibility to overseeing some of those actions.

Now, beyond that I can't, I can't give you any further question—I was not under medical treatment, psychiatric treatment, at no time.    I have had a lot tougher breaks than this one in my life and this one was hardly a major one.

Skane, like all members of society, must cope with life's indignities and failures. The ordinary person who loses an election or views an election as being imperfect will naturally be upset and disappointed.    However, in an already overly litigious society, this Court cannot fashion remedies for all life's disappointments.    Skane probably best summed up his lack of damages by saying, "I have had a lot tougher breaks ... in my life and this one was hardly a major one."    Because no actual damages exist, Skane is unable to recover punitive damages.    *Cates*, 650 P.2d at 1161.

### By–Law Amendment

In 1986, the Board of Directors amended the Association's by-laws, making it more difficult for the membership to amend the by-laws.    Skane sought to have the original by-law reinstated and claimed the Board of Directors' amendment was adopted in bad faith, was unreasonable and oppressive, and disturbed vested contractual and property rights.

Originally, Article XI of the by-laws read in pertinent part as follows:

*Section 1.    Powers of Members.*    The By–Laws of this Association may be adopted, amended or repealed at a meeting duly called for said purpose by the vote of a majority of the voting power represented at said meeting, provided a quorum is present....

*Section 2.    Powers of Directors.*    Subject to the right of the members to adopt, amend or repeal these By–Laws, as provided in Section 1 of this ARTICLE XI, at any special or regular meeting, the Board of Directors may adopt, amend, or repeal any of these By–Laws other than a By–Law or amendment thereof changing the authorized number of directors.

A quorum was defined as thirty percent of the members entitled to vote, so under the original by-law a majority of fifteen percent plus one member could conceivably amend the by-laws.

In 1986, the Board of Directors, upon the advice of legal counsel, amended Article XI, Section 1 to read in pertinent part as follows:

*Section 1.    Powers of Members.*    The By-laws of this Association may be adopted, amended, or repealed at a meeting duly called for said purpose by an affirmative vote of at least two-thirds (⅔) of the voting power of the entire membership of the Association.    For purposes of this provision, the entire membership shall refer to all members of the Association authorized to vote, and shall not refer to a two-thirds (⅔) majority in person or by proxy at the meeting.

The Board of Directors made the amendment because a small group called the Council of Concerned Members, of which Skane was a member, had proposed to amend the by-laws.    At a June 25, 1989, Board of Directors' meeting, the Association's attorney explained the dangers which could result from a small minority being allowed to amend the by-laws.    The attorney's comments were recorded in the Board of Directors' minutes as follows:

The membership is not obligated to follow by-laws as much as the board members and chaos would prevail.    He suggested that all of us retire if this ever occurs.    When the firing starts the by-laws are the only protection for the Board.    That's where we'll hide.    If you have membership making by-laws it's a

very, very [ ] dangerous situation. The few members that are making the changes will never take responsibility for 1640 members.

■ Skane claims the Board of Directors breached its fiduciary duty by acting in bad faith when it amended the by-law. As support for his allegation of bad faith, Skane points to the comments made by the Association's attorney at the 1989 Board of Directors' meeting and also to the fact that the by-law amendment was a response to actions proposed by the Council of Concerned Members.

In this case we can safely say that, as a matter of law, no material question of bad faith existed. The attorney's comments in 1989 explained why the original by-law should not be restored; his comments were not evidence of the 1986 Board of Directors' bad faith in amending the by-law. More importantly, the comments did not evidence any bad faith. The attorney was merely concerned that a minority of members could make changes without the majority's interests being protected.

Skane's only other support for his claim of bad faith is that the Board of Directors' minutes described the meeting to change the by-laws as "a special meeting to take action by the Board of Directors to change the By-Laws as recommended by our attorney due to ac[ti]on taken by the Council of Concerned [Members]." This statement demonstrated that the Board of Directors relied upon the advice of its attorney, not that it acted in bad faith.

■ Skane also argues that the amendment requiring a two-thirds majority is oppressive and unreasonable. He views the by-law amendment as being oppressive because a meeting had never been held when two-thirds of the membership were in attendance, much less when two-thirds of the membership voted affirmatively on a matter. According to Skane, the amended by-law made it virtually impossible for the membership to amend the by-laws.

Whether by-laws are reasonable or oppressive is normally a question of fact and, therefore, not appropriate for summary judgment. 18A Am.Jur. 2D *Corporations* § 319 (1985). However, in this case the membership essentially ratified the amended by-law at the 1987 annual meeting when, by a vote of 723 to 250, they denied a motion to reinstate the original by-law. Since the membership itself voted to retain the amended version, no material question of fact existed regarding the reasonableness of the by-law amendment.

■ Finally, Skane contends that by-laws are contractual in nature and that the original by-law created a vested contractual right which the Board of Directors had no authority to impair. He relies upon the distinction between by-laws which " 'are mere regulations governing the conduct of the internal affairs of the corporation,' and those 'in the nature of a contract which are evidently designed to vest property rights *inter se* among all stockholders.' " *Black v. Glass*, 438 So.2d 1359, 1371 (Ala.1983) (quoting *Bechtold v. Coleman Realty Co.*, 367 Pa. 208, 79 A.2d 661, 663 (1951)). Skane views the original by-law as being within the vested rights category because members relied upon the by-laws when they were purchasing property in the Association's subdivision.[4]

We agree with Skane that by-laws are contractual in nature, yet we disagree with his analysis that the original by-law created a vested right which could not be impaired. *See, e.g., Black*, 438 So.2d 1359; and 8 WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 4166 (perm. ed. 1982). To analyze this issue, we have limited statutory guidance. The only reference in Wyoming's nonprofit corporations statute regarding by-laws amendments says, "The power to alter, amend or repeal the bylaws or adopt new bylaws shall be vested in the board of directors unless otherwise provided in the

---

**4.** Skane also cites authority for the proposition that the right to vote is a vested right. He never explains how this authority related to the amended by-laws at issue here. The right to vote may be a vested right; however, the Association members were not denied the right to vote. Rather, a small fraction of members can no longer amend the by-laws.

certificate of incorporation or the bylaws." Wyo.Stat. § 17–6–107 (1989).[5]

The Association's by-laws clearly allowed the Board of Directors to amend the by-laws. Article XI, Section 2 provided the Board of Directors with authority to "adopt, amend, or repeal any of these By–Laws other than a By–Law or amendment thereof changing the authorized number of directors." Thus, anyone joining the Association was on notice that the by-laws were subject to amendment by the Board of Directors.

Apparently, under Skane's analysis, prospective purchasers relied upon the by-law which allowed members to amend the by-laws, yet they ignored the by-law giving the Board of Directors the right to make amendments. As one court has said:

"It is not one by-law or some by-laws of which the member must take notice, for he must take notice of all which affect his rights or interests. Where, as here, there is an express and clear reservation of the right to amend he is bound to take notice of the existence and effect of that reserved power.

" . . . Associations and corporations have a right to change their by-laws when the welfare of the corporation or association requires it. . . ."

*Orchard Ridge Country Club, Inc. v. Schrey,* 470 N.E.2d 780, 782–83 (Ind.App. 1984) (quoting *The Supreme Lodge, Knights of Pythias v. Knight,* 117 Ind. 489, 20 N.E. 479, 483 (1889) (citation omitted) ).

Despite the Board of Director's broad authority to amend the by-laws, a by-law which creates a vested right cannot be amended so as to impair that right. *Lam-* *bert v. Fishermen's Dock Cooperative, Inc.,* 61 N.J. 596, 297 A.2d 566, 568–69, 61 A.L.R.3d 967 (1972). *See also* 8 Fletcher, *supra,* at §§ 4177 and 4188. However, Skane fails to sufficiently articulate why the original by-law created a vested contractual or property right. The fact that a prospective purchaser relied upon a particular by-law was not sufficient to create a vested right. If mere reliance upon a by-law creates a vested right, a member could arbitrarily create a vested right by claiming he relied upon a particular by-law at the time he made his purchase. This would make every by-law potentially immune from amendment, no matter how trivial the proposed change might be. Because Skane fails to explain why the original by-law was a vested right, and we can discern no reason for its being a vested right, we hold that any right the members had in the original by-law is not superior to the Board of Directors' authority to amend the by-laws.

In summary, we hold that Skane's trespass action cannot lie because he lacked a possessory interest, nor can Skane recover for breach of a fiduciary duty when he did not suffer any actual damages. The Board of Directors' by-law amendment was not adopted in bad faith, was not unreasonable or oppressive, and did not disturb vested contractual or property rights.

Affirmed.

---

**5.** While it is not directly applicable, the Wyoming Business Corporation Act is interesting because Wyo.Stat. § 17–16–1001(b) (1989) states that a shareholder does not have a vested property right in the articles of incorporation.